**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Spectrum Pacific West LLC, | No. CV-20-01204-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| City of Yuma, et al., | |
| Defendant. | |

Plaintiff Spectrum Pacific West provides broadband internet access and digital voice services to residences and businesses in Yuma. Spectrum and Defendant City of Yuma entered into agreements in 2015 allowing Spectrum to use public rights-of-way in return for payments from Spectrum to Yuma. In 2018, Arizona passed a statewide law limiting the obligations local governments such as Yuma can impose on "cable systems," such as Spectrum. In 2020, Spectrum filed this suit alleging Yuma was violating the 2018 Arizona law by continuing to require performance of the 2015 agreements.

After the Court denied Yuma's motion to dismiss, Yuma filed a counterclaim labeled "declaratory action and in the alternative: for contract value." (Doc. 21 at 30). The counterclaim seeks a declaration that Spectrum remains bound by at least some of the 2015 agreements. Alternatively, if Spectrum is not bound by those agreements, Yuma seeks "full compensation for the value it has lost." (Doc. 21 at 30). Spectrum now argues the counterclaim "should be stricken or dismissed with prejudice" because it is duplicative of claims already pending. (Doc. 25 at 5). Yuma filed an opposition to that motion and,

shortly thereafter, Yuma filed another motion. The procedural basis for Yuma's motion is not clear but, in effect, Yuma is again seeking dismissal of Spectrum's claims. Alternatively, Yuma asks the Court to certify a question of Arizona law to the Arizona Supreme Court. (Doc. 39). Yuma has also filed a motion seeking to hold trial in Yuma instead of Phoenix, which Spectrum opposes. And finally, the parties have discovery disputes regarding Spectrum's requests for production. (Doc. 48).

## BACKGROUND

The parties dispute some of the most basic facts, such as which corporate entity is bound under various agreements. For present purposes, the Court will rely on the allegations in the complaint and counterclaim and will refer to the plaintiff as "Spectrum," even though the parties often refer to the plaintiff as "Charter."

In 2015, Spectrum and Yuma executed "four interrelated agreements." Those four agreements are identified as:

1. City Franchise Agreement,
2. CityNet Indefeasible Right of Use Agreement ("Right of Use Agreement"),
3. CityNet Maintenance Agreement ("Maintenance Agreement"), and
4. Transfer of Control Agreement.

(Doc. 1 at 4). Pursuant to the City Franchise Agreement, Spectrum was authorized "to construct and operate a cable system" in Yuma. (Doc. 1 at 10). The City Franchise Agreement required Spectrum pay Yuma a license fee equivalent to five percent of its gross revenues from the services it provided in Yuma. The City Franchise Agreement was set to expire on March 31, 2025. (Doc. 1 at 11).

The parties disagree how the three other agreements interacted with the City Franchise Agreement. In brief, the Right of Use Agreement and the Maintenance Agreement allowed Spectrum to use "certain fiber optic cables" but required Spectrum perform maintenance on certain physical equipment. These agreements required Spectrum perform the specified activities until January 31, 2035. (Doc. 1 at 12). Finally, the Transfer of Control Agreement was between Spectrum's predecessor-in-interest and Yuma. In that

agreement the obligations from the other agreements were transferred to Spectrum and Spectrum affirmed it would be bound by the other agreements. (Doc. 1-1 at 18). Overall, the various agreements from 2015 contemplated Spectrum would provide communications services in Yuma using public rights-of-way but Spectrum would have to pay Yuma a license fee, and perform maintenance activities, for that privilege.

In 2018, the Arizona legislature decided to adopt a statewide "uniform franchising regime" regarding "video service providers," such as Spectrum. (Doc. 1 at 7). Once in effect, this new state law required Arizona's local governments adopt a "uniform video service license agreement" containing only terms authorized by statute. A.R.S. § 9-1411(C). The 2018 law purported to allow providers like Spectrum the choice whether to keep its existing agreements with local governments in place or terminate those agreements and replace them with "uniform video service licenses" as set forth in the new law. A.R.S. § 9-1412(B). In December 2019, Spectrum notified Yuma it intended to "terminate its local cable franchise and associated documents" and pursue a uniform video license under the 2018 Arizona law. (Doc. 1-1 at 132). Yuma immediately responded by expressing its belief that the 2018 law was preempted by an order from the Federal Communications Commission. Yuma also expressed confusion what Spectrum meant by claiming it was terminating "associated documents." (Doc. 1-1 at 135). The parties have not provided information regarding any additional communications they had after those December 2019 letters.

On June 17, 2020, Spectrum filed the present suit. At that time, it appeared Spectrum's primary goal was to force Yuma to execute a uniform video license under the 2018 law. Thus, Spectrum alleged Yuma was violating the 2018 law and Yuma's refusal to comply with the 2018 law was preempted by federal law. After the Court denied Yuma's motion to dismiss, Yuma filed an answer containing a single counterclaim. Accordingly, Spectrum had applied for a "uniform video license agreement" shortly after filing its complaint. (Doc. 21 at 2). Yuma issued that license on August 13, 2020. And based on that issuance, Yuma's answer admits "Spectrum's 2020 Uniform Video Service License

Agreement" replaced the "2015 license," *i.e.* the City Franchise Agreement. (Doc. 21 at 11). But Yuma alleges the Right of Use Agreement and Maintenance Agreement were "separate agreements from the 2015 License" and Spectrum must continue to perform its obligations under those agreements. (Doc. 21 at 11).

Yuma's counterclaim seeks "a declaration that Spectrum remains bound by the terms and conditions" of the Right of Use Agreement and Maintenance Agreement. (Doc. 21 at 30). Alternatively, Yuma alleges that if those two "agreements may not be enforced in accordance with their terms, Yuma is entitled to full compensation for the value it has lost." (Doc. 21 at 30). Spectrum responded to the counterclaim by arguing it should "be stricken or dismissed with prejudice." (Doc. 25 at 5). According to Spectrum, Yuma's counterclaim "raises the same facts and issues [as] the Complaint" and Yuma is seeking "the mirror image of the relief [Spectrum] seeks." (Doc. 25 at 9). Spectrum believes allowing the counterclaim to proceed will result in a waste of "time and money" because all the parties' disputes will be resolved when Spectrum's claims are resolved. (Doc. 25 at 11). Yuma disagrees, pointing out its counterclaim is different from Spectrum's claims because Yuma is seeking an award of money damages.

While the motion to dismiss the counterclaim was pending, Yuma filed what it calls a motion to dismiss or in the alternative a motion to certify to the Arizona Supreme Court a question of state law. (Doc. 39). Despite having already answered Spectrum's complaint, Yuma's motion seeks dismissal based, in part, on Spectrum's failure to exhaust an administrative remedy before filing this suit. Yuma also appears to argue aspects of Spectrum's claims are moot because Yuma issued Spectrum a uniform license in August 2020. Yuma requests that, if there is any doubt whether administrative exhaustion was required, the Court should certify that question to the Arizona Supreme Court. (Doc. 39 at 9). Spectrum opposes this motion on both procedural and substantive grounds. (Doc. 52).

Despite the pending motions, the Court issued a Scheduling Order and the parties began pursuing discovery. (Doc. 31). On April 21, 2021, the parties filed a summary of discovery disputes. (Doc. 48). In brief, the parties disagree whether Spectrum propounded

too many requests for production. And finally, Yuma filed a motion to transfer trial to the federal courthouse in Yuma. (Doc. 45). Spectrum opposes transfer.

## ANALYSIS

Now that Yuma has issued a "Uniform Video Service License Agreement," the central dispute appears to be whether Spectrum must continue to perform its obligations under the Right of Use Agreement and the Maintenance Agreement. According to Spectrum, the 2018 law means it is not required to perform under those agreements while Yuma claims the 2018 law had no impact on the enforceability of those agreements. The first issue is whether Yuma's counterclaim is purely duplicative of Spectrum's claims such that the counterclaim should be dismissed.

### I.      Spectrum's Motion to Dismiss the Counterclaim

To understand the parties' dispute involving the viability of Yuma's counterclaim, it is necessary to set out the claims pled by Spectrum. According to Spectrum's complaint, it is asserting three claims: 1) "Violation of Arizona Uniform Franchise Law"; 2) "Violation of [Federal] Cable Act"; and 3) "Declaratory Judgment." (Doc. 1 at 15-16).

Spectrum purports to bring its first claim under Arizona's Uniform Franchise Law. A.R.S. § 9-1401 *et seq.* That claim alleges Yuma is violating state law and, as a remedy, Spectrum seeks a "declaration" that Yuma is violating Arizona law as well as "injunctive relief prohibiting" Yuma from enforcing any of the parties' 2015 agreements. (Doc. 1 at 15-16). Spectrum has never identified the exact cause of action it is alleging in this claim. As explored later, Arizona's Uniform Franchise Law has administrative procedures when a video service provider believes a local government is violating the law. A.R.S. § 9-1451(A). But those procedures start with an administrative complaint, not a lawsuit. Moreover, it is unclear whether a private right of action exists under Arizona's Uniform Franchise Law. *See Napier v. Bertram*, 954 P.2d 1389, 1391 (Ariz. 1998) ("A statute's silence on whether a cause of action is conferred by the statute or should be recognized as a result of the statute is not dispositive.").

For its second claim, Spectrum asserts a "preemption claim." A prior Order noted

this was "a preemption claim arising under the Supremacy Clause of the Constitution." (Doc. 18 at 7). This preemption claim is unusual. Spectrum's theory is that Yuma's "refusal to obey state franchising law . . . is inconsistent with the recognition of state authority in the federal framework and is therefore preempted." (Doc. 1 at 16). In other words, Spectrum believes Yuma's violation of state law is "preempted" by federal law because federal law grants states, not local governments, the ultimate power to regulate in this area. Whether this "preemption" claim is viable is not important for present purposes.[1]

Finally, Spectrum's third claim is for "declaratory judgment." This claim is based on Spectrum's belief the Right of Use Agreement and Maintenance Agreement "contain terms and conditions inconsistent with and preempted by Arizona and federal law." (Doc. 1 at 17). Spectrum seeks "a declaration" the Right of Use Agreement and Maintenance Agreement are "terminated by operation of law." (Doc. 1 at 17). Put in terms more commonly found in declaratory relief actions, Spectrum claims it is not required to perform under the 2015 agreements while Yuma claims Spectrum is. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 134 (2007). Spectrum's complaint does not explain how this third claim differs from its first claim.

In answering Spectrum's complaint, Yuma pled a counterclaim for "declaratory action and in the alternative: for contract value." (Doc. 21 at 30). Yuma requests "a declaration that Spectrum remains bound by the terms and conditions" of the Right of Use Agreement and Maintenance Agreement, or alternatively, an award of money damages. The counterclaim does not identify the source for the money damages request.

Spectrum moves to dismiss or strike the counterclaim as "entirely duplicative" of Spectrum's claims. Spectrum argues its three claims adequately cover all possibilities such that litigating Yuma's counterclaim for declaratory relief will serve no useful purpose. Spectrum also asserts that allowing the counterclaim to proceed will result in wasted "expenditure of time and money" because the same issues will be litigated twice. (Doc. 25

---

[1] It is not clear what purpose this claim is serving. The claim does not appear necessary to secure federal jurisdiction because Spectrum's complaint alleged diversity jurisdiction as well. And if Yuma's actions violate Arizona law, Spectrum will be entitled to relief without the need to resolve any dispute involving federal preemption.

- 6 -

at 11).

Courts routinely dismiss as unnecessary counterclaims that involve exactly the same issues as already-pending claims. *See, e.g.*, *Disney Enterprises, Inc. v. VidAngel, Inc.*, 2017 WL 6883685, at *9 (C.D. Cal. Aug. 10, 2017) (dismissing counterclaims to avoid "duplicative litigation"). If Yuma's counterclaim were purely duplicative, it would be dismissed on that basis. The complication here, however, is that Yuma describes its counterclaim as not limited solely to declaratory relief. According to Yuma, its counterclaim alternatively seeks an award of money damages in the event the Right of Use Agreement and Maintenance Agreement are found to no longer apply.

At present, Yuma's counterclaim does not allege any basis by which Yuma might be entitled to money damages. That is, Yuma seems to believe it has asserted a breach of contract claim, but the counterclaim fails to do so. (Doc. 28 at 6) (describing counterclaim as "a claim for money damages associated with the breach" of certain agreements). Thus, the current version of the counterclaim is duplicative of Spectrum's claims and will be dismissed with leave to amend. Should Yuma chose to amend, it must set forth, if it can legally and factually, a clear basis for its request for money damages.

## II. Yuma's Motion to Dismiss Spectrum's Claims

Yuma answered Spectrum's complaint but subsequently filed a "motion to dismiss" based on Spectrum's alleged failure to exhaust administrative remedies regarding the state-law claim. Spectrum argues a "motion to dismiss" is inappropriate because Yuma already answered the complaint. Yuma responds that its motion is raising a jurisdictional argument that can be raised through a post-answer motion to dismiss. There is some dispute whether Yuma's argument regarding administrative exhaustion is, in fact, a jurisdictional argument that can be raised at any time.[2] However, Yuma's argument fails on the merits. Therefore, the Court need not resolve if Yuma's motion was procedurally improper.

---

[2] Yuma cites *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003) as authorizing an "unenumerated Rule 12(b) motion" based on failure to exhaust nonjudicial remedies. (Doc. 39 at 7). That case was explicitly overruled in *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014). Pursuant to *Albino*, the proper motion in this context likely was a motion for summary judgment.

Yuma argues Spectrum's first and third claims, based on alleged violations of Arizona's Uniform Franchise Law, must be dismissed for failure to exhaust administrative remedies. According to Yuma, the language of the Uniform Franchise Law establishes a mandatory administrative exhaustion requirement. Spectrum agrees the Uniform Franchise Law establishes an administrative regime, but Spectrum believes that regime is merely permissive. Spectrum argues it was entitled to file the present suit without exhausting its remedies.

Under Arizona law, a court may not hear a case when a "party fails to exhaust mandatory administrative remedies."[3] *Walters v. Maricopa Cty.*, 990 P.2d 677, 680 (Ariz. Ct. App. 1999). "The exhaustion requirement does not apply, however, if the administrative remedy expressly or impliedly authorized by statute is permissive." *Id.* Arizona courts sometimes use the phrase "original jurisdiction" when referring to mandatory exhaustion regimes. For example, one court explained if "a statute grants an administrative agency original jurisdiction over a dispute, the exhaustion of remedies doctrine compels the parties to avail themselves of all available administrative processes before seeking the aid of a court." *Coconino Cty. v. Antco, Inc.*, 148 P.3d 1155, 1159 (Ariz. Ct. App. 2006). Similarly, "[t]o determine whether a party is required to exhaust administrative remedies, the courts must determine whether an administrative agency has original jurisdiction over the subject matter."[4] *Hamilton v. State*, 925 P.2d 731, 734 (Ariz.

---

[3] In a few decisions the Arizona Court of Appeals has noted "the doctrine of exhaustion of administrative remedies does not implicate subject-matter jurisdiction." *Moulton v. Napolitano*, 511, 73 P.3d 637, 642 n.2 (Ariz. Ct. App. 2003) (quoting *Medina v. Arizona Dep't of Transp.*, 916 P.2d 1130, 1134 (Ariz. Ct. App. 1995)). But many other decisions by the Arizona Court of Appeals hold directly to the contrary. *See, e.g.*, *Walters v. Maricopa Cty.*, 990 P.2d 677, 680 (Ariz. Ct. App. 1999) ("If a party fails to exhaust mandatory administrative remedies and pursues judicial relief instead, the superior court lacks jurisdiction over the matter."). In 1971, the Arizona Supreme Court held if a party files suit before exhausting mandatory administrative remedies, "the trial court is without jurisdiction to entertain such action." *Mountain View Pioneer Hosp. v. Emp. Sec. Comm'n*, 482 P.2d 448, 452 (Ariz. 1971). Thus, the weight of authority appears to be that this is a jurisdictional issue. The precise label is not important for present purposes.

[4] Like the question whether exhaustion is a "jurisdictional" matter, the Arizona courts have not been clear whether "original jurisdiction" should, in fact, be synonymous with mandatory exhaustion regimes. In *Campbell v. Mountain States Tel. & Tel. Co.*, 586 P.2d 987, 990 (Ariz. Ct. App. 1978), the court explained the first inquiry is whether an agency has "original jurisdiction." If an agency has "original jurisdiction," "the exhaustion of remedies doctrine is used to determine whether or not the parties must completely exhaust

Ct. App. 1996). Arizona cases thus establish the simple rule that when an agency has "original jurisdiction," exhaustion of remedies is mandatory. *Arizona Dep't of Econ. Sec. v. Redlon*, 156 P.3d 430, 433 (Ariz. Ct. App. 2007) (mandatory exhaustion of remedies applies "only when the statutory mandate grants an administrative agency original jurisdiction over a matter").

The administrative remedy statute relevant here is Article 5 of the Uniform Franchise Act. A.R.S. § 9-1451. The crucial language of that statute provides:

> A. A local government may file a written complaint against a video service provider and a video service provider may file a written complaint against a local government alleging a violation of this chapter or the uniform video service license agreement. Unless otherwise provided in § 9-1445, subsection F, G and H or this section:
>
> 1. All complaints must be filed with the office of administrative hearings.

Article 5 also outlines how any complaint filed with the Office of Administrative Hearings ("OAH") will be handled. Once the OAH issues a "final administrative decision," that decision "may be appealed to the superior court pursuant to [Arizona's Administrative Review Act, A.R.S. § 12-901 *et seq.*]." A.R.S. § 9-1451(I).

The parties' disagreement is whether the language of A.R.S. § 9-1451(A) imposes a mandatory or permissive exhaustion regime. According to Yuma, the statutory language that "All complaints must be filed with the office of administrative hearings" establishes a mandatory administrative regime. In Yuma's view, that sentence makes clear a party "must" file a complaint with the OAH before filing suit. Yuma concedes a party can, eventually, proceed to court. But that court action comes only after administrative procedures and the court's review is governed by the Arizona Administrative Review Act. A.R.S. § 9-1451(I). Spectrum counters by citing the statutory language that a provider "may file" a complaint against a local government. A.R.S. § 9-1451(A). In Spectrum's view, "may" should be read as permissive, not mandatory. Thus, Spectrum believes a party

---

the available administrative processes before seeking the aid of a court." *Id.* If "original jurisdiction" was meant to be synonymous with mandatory exhaustion regimes, the second step in this analysis would be unnecessary.

- 9 -

"may" file an administrative complaint and, only if a party chooses to do so, "must" that complaint be filed with the OAH.

The parties have not cited, and the Court has not located, a single case addressing the exhaustion requirement under Arizona's Uniform Franchise Act. The only instructive caselaw comes from decisions involving different statutes with different language. Arizona caselaw, however, follows a general rule that mandatory administrative regimes must be based on an "express statutory mandate." *Est. of Bohn v. Waddell*, 848 P.2d 324, 331 (Ariz. Ct. App. 1992). *See also Hamilton v. State*, 925 P.2d 731, 734 (Ariz. Ct. App. 1996) (same). Arizona courts "construe statutes in favor of retaining jurisdiction and will not find divestiture [of jurisdiction] unless stated clearly, explicitly, and unambiguously." *Walters v. Maricopa Cty.*, 990 P.2d 677, 680 (Ariz. Ct. App. 1999). Accordingly, a court should conclude a particular administrative regime is mandatory only if there is "clear and unambiguous" language to that effect. *Id.*

Here, the statutory language is that Spectrum "may file" an administrative complaint. Under Arizona law, the term "may" is ambiguous because it is "capable of conveying either a mandatory or permissive requirement." *Sempre Ltd. P'ship v. Maricopa Cty.*, 235 P.3d 259, 262 (Ariz. Ct. App. 2010)). In general, however, "the use of 'may' indicates permissive intent and a grant of discretion." *Garcia v. Butler in & for Cty. of Pima*, 487 P.3d 256, 259 (Ariz. 2021). For example, one Arizona court concluded the statutory phrase providing a taxpayer "may appeal" a property tax valuation established a permissive administrative regime. *Sempre*, 235 P.3d at 262. Similarly, another court concluded a permissive administrative regime was established by language that a public employee "may make a complaint to an appropriate independent personnel board." *Walters*, 990 P.2d at 679. In reaching that conclusion, the court reasoned "[i]f the legislature had wanted to make the statute mandatory, it could easily have said so." *Id.* at 680.

Based on Arizona's rule requiring "clear and unambiguous" language before concluding an administrative regime is mandatory, as well as the general rule that "may"

indicates a permissive regime, the language of A.R.S. § 9-1451(A) does not suffice to require administrative exhaustion. If the Arizona legislature had intended for the Uniform Franchise Act to impose a mandatory administrative regime, "it could easily have said so." *Walters*, 990 P.2d at 680. In fact, the Arizona legislature did precisely that regarding a particular type of dispute that may arise between local governments and providers under the Uniform Franchise Act. According to A.R.S. § 9-1445(F), if a local government believes a provider has underpaid a license fee, or if a provider believes it has overpaid a license fee, a complaint alleging such a claim "shall be made pursuant to [A.R.S. § 9-1451]." Using "shall be made pursuant" to the administrative procedure to describe one type of dispute, but leaving all other disputes subject to the "may" be filed language, indicates a difference. *See Sempre Ltd. P'ship v. Maricopa Cty.*, 235 P.3d 259, 262 (Ariz. Ct. App. 2010) (use of "may" and "shall" in same statute indicates different meaning). The text of A.R.S. § 9-1451 is best read as establishing a permissive administrative regime. Yuma offers two non-textual arguments that do not change this conclusion.

First, Yuma argues the "OAH believes it has original jurisdiction." (Doc. 39 at 4). Citing annual reports issued by the OAH, Yuma argues OAH has concluded it "was given original jurisdiction to hear and determine disputes arising out of video service provider agreements between video service providers and local governments." (Doc. 39 at 4). Yuma interprets the use of "original jurisdiction" by the OAH as a clear indication the OAH believes the administrative regime is mandatory. Yuma also cites testimony from the "acting director" of the OAH at the time the Arizona legislature was considering the bill that became the Uniform Franchise Act. That testimony included a statement that the OAH "can handle" complaints that might be made under the statute. (Doc. 39 at 5).

Arizona law requires significant caution in resorting to statements by "nonlegislators" to determine the meaning of statutes. *Sempre*, 235 P.3d at 264. The statements by the OAH in the annual reports are not accompanied by any citation to the statute itself nor is there any explanation why the OAH reached its conclusion. Moreover, a simple statement that the OAH "can handle" complaints does not establish the

administrative regime is mandatory. The legislature likely would be interested in the OAH's ability to hear these cases whether it was imposing a permissive or mandatory regime. In short, neither OAH's annual reports nor the testimony establish Spectrum was required to exhaust before filing suit.

Yuma's second non-textual argument in support of imposing a mandatory administrative regime is that deeming the regime permissive will "creat[e] a choice between federal court and the OAH." (Doc. 63 at 2). While not explained in full, Yuma appears to believe Arizona superior courts are not allowed to hear any claims involving the Uniform Franchise Act except through judicial review of a final administrative decision. According to Yuma, if the administrative regime is found merely to be permissive, federal courts will be free to entertain claims when there has been no administrative proceedings while superior courts would have to dismiss such claims. Yuma has not cited any authority in support of this position and it does not seem consistent with Arizona law. If, as the Court has concluded, the administrative regime is permissive, there is no difference between proceeding in superior court or in federal court. That is, a permissive administrative regime means an interested party can proceed directly to litigation, either in superior court or, if federal jurisdiction exists, in federal court. Yuma's concern over a "lack of parity" between federal and state courts is not convincing.

Given that "clear and unambiguous" language is necessary to establish a mandatory administrative regime, the language of A.R.S. § 9-1451 is not sufficient. Therefore, Spectrum was entitled to file this suit without exhausting its administrative remedies.[5]

### III. Certification to Arizona Supreme Court

In its motion to dismiss Yuma argued that, should Spectrum's claims not be dismissed, the Court should "certify the question of mandatory original jurisdiction of the

---

[5] Throughout its briefing Yuma refers to some of Spectrum's claims, or portions of Spectrum's claims, as "moot." Yuma has not presented this argument clearly such that the Court can address it. To the extent Yuma has now issued a uniform video service license to Spectrum, it does appear any portion of Spectrum's claims requesting issuance of such a license are moot. But there are other disputes, involving the other 2015 agreements, that remain live. Therefore, the issuance of a uniform video service license to Spectrum cannot prevent this case from proceeding.

- 12 -

OAH to the Arizona Supreme Court." (Doc. 39 at 9). Spectrum opposed that motion, arguing the question of original jurisdiction did not merit certification. In its reply, Yuma significantly altered the "question" at issue. According to that reply, the question is not only "whether OAH has original jurisdiction," but also "whether the Uniform License Statute invalidates separate, previously entered contractual obligations between an Arizona municipality and a cable provider." (Doc. 63).

Existing Arizona authority provides sufficient guidance such that there is no need to certify the question of original jurisdiction to the Arizona Supreme Court. *See High Country Paving, Inc. v. United Fire & Cas. Co.*, 14 F.4th 976, 978 (9th Cir. 2021) (noting certification appropriate only in rare cases). Similarly, there is no need to certify Yuma's vague question "whether the Uniform License Statute invalidates" other contracts. It was improper for Yuma to alter its request in its reply because Spectrum had no opportunity to brief the altered request. More importantly, Yuma itself has provided no meaningful briefing on this new question involving the impact the statute has on "separate, previously entered contractual obligations." The request for certification will be denied in full.

**IV.    Transfer to Yuma for Trial**

Yuma "requests the Court transfer the trial of this matter to the John M. Roll Courthouse, in Yuma, Arizona." (Doc. 45 at 9). Yuma contends the "vast majority of proof exists in Yuma, along with the majority of witnesses." (Doc. 45 at 7). Spectrum responds transfer is not appropriate because Spectrum is entitled to the forum of its choice and it will be "far more costly and inconvenient for [Spectrum] to try the case in Yuma" than in Phoenix. (Doc. 53 at 6).

The Court need not assess whether transfer of the trial to Yuma is permitted or appropriate. *Cf. Ave. 6E Invs. v. City of Yuma*, 2018 WL 1899054, at *3 (D. Ariz. Apr. 19, 2018) (ordering trial to be held in Yuma). At this point, any such ruling would be premature. This case may not progress to trial and, even if it does, assessing the appropriate location of that trial will be simpler based on a more developed record regarding which witnesses and evidence will be introduced. The request to transfer trial to Yuma will be

denied.

## V. Discovery Disputes

On February 24, 2021, the Court issued a Scheduling Order allowing each party to serve "25 requests for production of documents, including subparts." (Doc. 31 at 2). The parties subsequently filed a discovery dispute on April 21, 2021. (Doc. 48). In brief, Yuma believes Spectrum violated the limit of 25 requests while Spectrum believes it has not.

Before it learned of the numeral limit, Spectrum propounded 43 requests for production. After the Court set the numerical limit, Spectrum edited its requests for production to make them appear as if they complied with the numerical limit. Spectrum did so by collapsing many separate requests into fewer, much broader, requests. Given that Spectrum itself identified the requests as originally numbering 43, its request to simply collapse those requests was not made in good faith and will be rejected. Spectrum must comply with the numerical limit and, if necessary, seek leave from the Court for additional requests.

Accordingly,

**IT IS ORDERED** the Motion to Dismiss Counterclaim (Doc. 25) is **GRANTED**. If the City of Yuma wishes to file an amended counterclaim, it must do so no later than **February 9, 2022**.

**IT IS FURTHER ORDERED** the Motion to Dismiss or in the Alternative Motion to Certify (Doc. 39) is **DENIED**.

**IT IS FURTHER ORDERED** the Motion to Transfer Trial (Doc. 45) is **DENIED**.

…

…

…

…

…

…

…

1   **IT IS FURTHER ORDERED** no later than **February 4, 2022**, the parties shall file a joint status report setting forth their positions on the status of discovery and the remaining case management deadlines. If appropriate, the parties should propose new case management deadlines. Absent further order from the Court, the current deadline of **March 4, 2022**, for dispositive motions remains in place.

Dated this 31st day of January, 2022.

Honorable Roslyn O. Silver
Senior United States District Judge