**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Spectrum Pacific West LLC, | No. CV-20-01204-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| City of Yuma, et al., | |
| Defendant. | |

Plaintiff Spectrum Pacific West LLC and Defendant City of Yuma entered into agreements in 2015 regarding Spectrum's operations in Yuma.  In 2018, Arizona passed a statewide law that limited the obligations local governments could impose on companies, such as Spectrum, that provide "cable and other advanced communications services . . . to residential and business subscribers."  (Doc. 1 at 2).  Spectrum believes the 2018 law means its "obligations" under all of the 2015 agreements with Yuma were "terminated by operation of law."  (Doc. 1 at 15).  Yuma agrees the 2018 law required one of the parties' agreements be replaced by a different agreement.  But Yuma believes the other agreements remain in effect.

In 2020, Spectrum filed this suit seeking, among other relief, declaratory judgment that all the parties' 2015 agreements had been terminated based on the new Arizona law. Yuma then filed counterclaims alleging Spectrum breached some of the 2015 agreements. Spectrum filed a motion to dismiss those counterclaims, arguing Yuma had not alleged it suffered any cognizable form of damages.  Before that motion was resolved, Spectrum

1   filed a motion for judgment on the pleadings regarding its own claims for declaratory

2   relief.  Spectrum argues its complaint and Yuma's answer make clear all of the parties'

3   2015 agreements were terminated as a matter of law.

4        Viewed in the light most favorable to Yuma, there are adequate allegations to

5   support one of its counterclaims.  And while Spectrum may, eventually, be entitled to

6   judgment as a matter of law, it has not established its entitlement to such relief at this

7   point.  Therefore, Spectrum's motion for judgment on the pleadings will be denied.

8                                    **BACKGROUND**

9        Prior to 2015, Spectrum held a nonexclusive license to provide cable service in

10  Yuma.[1]  In early 2015, Spectrum and Yuma began negotiating a variety of different

11  agreements, including a renewal of the license.  According to Yuma, the parties' history

12  from 1995 through 2015 of negotiating "performance disputes, and other issues" directly

13  impacted the form the various agreements took in 2015.  (Doc. 71 at 7).  In particular,

14  Yuma alleges that some of the parties' disputes before 2015 prompted Yuma to insist the

15  parties enter into a number of "separate" agreements.  (Doc. 71 at 7).  In February and

16  March 2015, Spectrum and Yuma executed three agreements:

17      1)  CityNet Indefeasible Right of Use Agreement;

18      2)  CityNet Maintenance Agreement; and

19      3)  City Franchise Agreement ("franchise" and "license" are used interchangeably).

20  Understanding some of the terms of each agreement is necessary to resolve the pending

21  motions.

22      **A. Indefeasible Right of Use Agreement (Doc. 1-1 at 92)**

23       The CityNet Indefeasible Right of Use Agreement ("IRU Agreement") grants

24  "Yuma an indefeasible right of use to specific optical fibers embedded in Spectrum's

25  system." (Doc. 71 at 7).  On the first page of the IRU Agreement, the parties recite they

26  _____

27  [1] The license was held by Spectrum's predecessor-in-interest.  (Doc. 1-1 at 31).  Pursuant
    to a Transfer of Control Agreement executed in December 2015, Spectrum assumed its
28  predecessor's rights and obligations.  (Doc. 1-1 at 17).  For simplicity, the Court will
    refer to "Spectrum" instead of differentiating between the predecessor-in-interest and
    Spectrum.

"desire to enter into a separate agreement for an institutional network that will preserve [Yuma's] rights to use" a particular set of "fiber and coaxial lines."  (Doc. 1-1 at 92). Those fiber and coaxial lines are the lines "now existing or hereinafter installed pursuant to the CityNet Maintenance Agreement, which is a separate Agreement for which there is separate consideration."  (Doc. 1-1 at 92).  The IRU Agreement also identifies itself as "not an executory contract" but instead as "a fully performed transfer of irrevocable right of use."[2]  (Doc. 1-1 at 92).

The IRU Agreement took effect on February 1, 2015, and claims it will remain in effect until January 31, 2035.  (Doc. 1-1 at 96).  The IRU Agreement contemplates the possibility of "regulatory changes" that might occur during its twenty-year term.   A provision of the IRU Agreement states, in full:

> **REGULATORY CHANGES**
>
> The parties agree that in the event a decision by a telecommunications regulatory authority at the federal or state level necessitates modifications in this Agreement, the parties will negotiate in good faith to modify this Agreement in light of such decision.

(Doc. 1-1 at 95).  Spectrum has not pointed to any aspect of the IRU Agreement that states the agreement was intended to be incorporated into a license agreement.

**B.  CityNet Maintenance Agreement (Doc. 1-1 at 105)**

The CityNet Maintenance Agreement, signed in February 2015, grants Yuma "the right to maintain and repair" specific optical fibers in Spectrum's system.  (Doc. 71 at 10).  Under this agreement, Spectrum performs maintenance activities in return for an

---

[2] The IRU Agreement does not provide meaningful guidance on what the parties intended when they identified the agreement as "not an executory contract."  As one treatise has noted, the attempt to divide contracts into "executed" and "executory" can be confusing. § *See* 1 *Williston on Contracts* § 1:19 (4th ed.).  In general, however, "the courts continue to speak of executory and executed contracts, the former term meaning a contract, the obligation of which relates to the future, or a contract under which the parties have bound themselves to future activity that is not yet completed or performed."  *Id.*  Given that the IRU Agreement promised Spectrum would grant Yuma access to a particular set of fibers for an identified amount of time, it is not clear if it was properly identified as "not an executory contract."

annual fee. (Doc. 71 at 11). This agreement also allows for the construction of additional optical fibers at a set fee. (Doc. 71 at 11). According to Yuma, the CityNet Maintenance Agreement was, and remains, "independent of" the 2015 City Franchise Agreement. (Doc. 71 at 10). The CityNet Maintenance Agreement does, however, identify discrete portions of a license that had been issued in 1995 and states those portions "no longer apply." (Doc. 1-1 at 123). Immediately after setting out the portions of the earlier license that would no longer apply, the CityNet Maintenance Agreement has an entire section titled "Independent Contract." That section states, in full:

> This Agreement is not part of, or entered into, as a condition of being issued a new, renewed or amended License to provide cable service. However, as provided in Section 10, this Agreement is contingent on [Spectrum] providing services in [Yuma]. This Agreement provides for no in-kind services or payments to [Yuma] but instead is a transaction supported by fair and reasonable consideration. [Spectrum] may not offset any costs associated with this Agreement against any fee levied or assessed against it under its License.

(Doc. 1-1 at 123). The CityNet Maintenance Agreement contemplates it will remain in effect until January 31, 2035. (Doc. 1-1 at 118).

The CityNet Maintenance Agreement prohibits either party from taking actions that might prevent complete performance of their contractual duties. The agreement states, in relevant part, "Neither party shall take any action, or require the other party to take any action that causes it to be unable to satisfy the performance requirements of this Agreement." (Doc. 1-1 at 115).

### C. 2015 City Franchise Agreement

The 2015 City Franchise Agreement was effective as of March 2015, shortly after the IRU Agreement and the CityNet Maintenance Agreement took effect. The 2015 City Franchise Agreement granted Spectrum the right to use public rights of way to construct and operate a cable system. In return, Spectrum was required to pay a license fee of five percent of its gross revenues. The 2015 City Franchise Agreement was expected to remain in effect until March 31, 2025. (Doc. 1-1 at 33).

### D. Legal Changes and This Litigation

- 4 -

In 2018, Arizona enacted a statewide "uniform franchising regime" for companies, such as Spectrum, that wish to provide cable and video services to localities in Arizona. (Doc. 1 at 7).   Pursuant to the 2018 law, companies were entitled to keep existing franchise agreements with local governments in place or obtain a "uniform video license" under the terms outlined in the law.  Spectrum concluded a "uniform video license" from Yuma would be better than the existing 2015 City Franchise Agreement and Spectrum pursued such a license.

Shortly after the 2018 law went into effect, the parties had preliminary communications about Spectrum obtaining a "uniform video license" from Yuma.  Those communications did not lead to an agreement and Spectrum eventually concluded it should pursue litigation to force Yuma to enter into a "uniform video license."  In June 2020, Spectrum filed the present suit.  At the time the complaint was filed, it appeared Spectrum's focus was on obtaining a "uniform video license."   Shortly after the complaint was filed, Spectrum and Yuma executed such a license and the parties agree that license "replaced" the 2015 City Franchise Agreement.  (Doc. 71 at 13).  Thus, what appeared to be the main goal of Spectrum's complaint was accomplished shortly after it was filed.  Spectrum, however, was not satisfied with that result.

According to Spectrum, this litigation was filed not only to obtain a "uniform video license" but also to obtain a declaration that, based on the 2018 law, the other 2015 agreements were terminated by operation of law.  Yuma does not agree the 2018 law and the new "uniform video license" granted to Spectrum had any impact on the remaining 2015 agreements.    Believing those agreements remain in place, Yuma answered Spectrum's complaint and asserted counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.

According to Yuma, the IRU Agreement and CityNet Maintenance Agreement were intended as, and remain, independent from the 2015 City Franchise Agreement. Thus, the fact that Yuma issued a new license superseding the 2015 City Franchise Agreement has no relevance to the enforceability of the two other agreements.  Yuma

believes Spectrum "has taken actions inconsistent with and in direct violation of the terms and conditions" of the non-license 2015 agreements.  (Doc. 71 at 20).  In particular, Spectrum has breached the non-license 2015 agreements by "seeking to void and terminate the performance of the [agreements]."  (Doc. 71 at 19).  This has "forced Yuma to seek alternative sources for its critical communications infrastructure, which alternative [], upon information and belief, will cost Yuma in excess of $2 million dollars, damages for which Spectrum is liable."  (Doc. 71 at 20).  In addition to those damages, Yuma alleges it has been damaged by having to "incur costs and [attorneys'] fees in pursuit of its rightful interests in this matter."  (Doc. 71 at 20).

Spectrum filed a motion to dismiss the counterclaims and, a few weeks after that motion was fully briefed, Spectrum filed a motion for judgment on the pleadings.  That motion argues the relevant agreements are incorporated into Spectrum's complaint and both statutory interpretation and contract interpretation are questions of law.  Therefore, Spectrum argues the Court can determine, based solely on Spectrum's complaint and Yuma's answer, that Spectrum is entitled to relief in the form of a declaration that none of the agreements from 2015 remain in effect.

## ANALYSIS

If Spectrum's motion for judgment on the pleadings were granted, the parties' 2015 agreements would be deemed terminated such that Yuma's counterclaims might be futile.  Therefore, the Court will begin with the recently filed motion for judgment on the pleadings.

### I.    Spectrum's Motion for Judgment on the Pleadings

A plaintiff seeking judgment on the pleadings requires the Court apply an unusual standard.  The Court must accept all of Yuma's allegations in its answer as true and all of Spectrum's allegations "which have been denied are assumed to be false."  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989).  Given the parties' competing factual allegations, it is difficult to identify the precise allegations the Court must accept as true.  But the parties agree on two basic facts crucial to resolving

Spectrum's motion: 1) in 2015, the parties entered into the 2015 City Franchise Agreement, the IRU Agreement, and the CityNet Maintenance Agreement; and 2) in 2020, Yuma issued Spectrum a "uniform video license" that replaced the 2015 City Franchise Agreement.  Based on those agreed facts, the question is whether the IRU Agreement and the CityNet Maintenance Agreement have been "terminated" as a matter of law.

Spectrum's motion makes two arguments in support of its position that the agreements have been terminated.  First, Spectrum claims that as a matter of contract law, all of the 2015 agreements were "interrelated" such that when the 2015 City Franchise Agreement was terminated in 2020, the other two 2015 agreements necessarily were terminated as well.  Second, Spectrum argues the 2018 Arizona statute prohibits Yuma from enforcing the IRU Agreement and CityNet Maintenance Agreement, meaning the agreements must be deemed terminated pursuant to Arizona law.  Based solely on the arguments presented in the parties' filings, Spectrum's motion will be denied.

### A. Contract Law

Spectrum is adamant the 2015 City Franchise Agreement "expressly incorporated" the IRU Agreement and CityNet Maintenance Agreement.  (Doc. 81 at 6).  Spectrum claims all three 2015 agreements were "interrelated" such that "[t]he fount of all of [Spectrum's] obligations is the [2015 City] Franchise Agreement."  (Doc. 81 at 11).  Spectrum's obligations under the IRU Agreement and CityNet Maintenance Agreement allegedly "flow from, depend on, and were expressly incorporated into the [2015 City] Franchise Agreement." (Doc. 81 at 11).  Thus, when the 2015 City Franchise Agreement was terminated, the other two agreements were terminated as well.  While Spectrum makes these unequivocal statements, it does not identify the exact provisions in the various agreements that rendered them all "interrelated" the way Spectrum claims.

The contractual language Spectrum cites in support of this incorporation theory is section 2(j) of the 2015 City Franchise Agreement.  That section, titled "Claims Related to Prior License," stated Yuma was releasing any claims it had "for fines, damages,

penalties or otherwise" that arose under the pre-2015 license.  The section then stated, "[i]n return, [Spectrum] has agreed to comply with its obligations under this agreement, the [IRU Agreement], and the [CityNet Maintenance Agreement]."  (Doc. 1-1 at 37). Spectrum does not explain how this language dictates that termination of the 2015 City Franchise Agreement necessarily resulted in termination of the other two agreements. There is no obvious reason why Spectrum's choice to reaffirm its obligations under the other two agreements in the 2015 City Franchise Agreement meant the franchise agreement was the "fount" of all of Spectrum's obligations.  And Spectrum's position that only the 2015 City Franchise Agreement mattered is hard to square with the language of the two other agreements.

The IRU Agreement identifies itself as a "separate agreement" granting Yuma a right to use particular fiber and coaxial lines.  It also states it is "not an executory contract" but "a fully performed transfer of irrevocable right of use."  (Doc. 1-1 at 92). This language provides no hint the parties anticipated the IRU Agreement would be incorporated into the 2015 City Franchise Agreement or that termination of 2015 City Franchise Agreement would terminate the IRU Agreement.  In fact, the IRU Agreement purports to be effective until 2035.  The 2015 City Franchise Agreement was to last only until 2025.  Given those dates, Spectrum's position that the agreements rise and fall together is difficult to understand.

The CityNet Maintenance Agreement was even more explicit that it was intended to be entirely separate from the 2015 City Franchise Agreement.  The CityNet Maintenance Agreement had an entire section identifying it as an independent contract. That section provided, in relevant part, the CityNet Maintenance Agreement was "not part of, or entered into, as a condition of [Spectrum] being issued a new, renewed or amended License to provide cable service."  Spectrum does not address this language nor is there an obvious way to read this language as indicating an intent to link the maintenance agreement with the franchise agreement.

Beyond the language in the various agreements, Yuma also argues there is ample

- 8 -

extrinsic evidence establishing the parties' intent for the three agreements to be entirely independent. Spectrum believes contract interpretation presents a question of law such that the parties' understanding of the contractual language is not relevant. Spectrum's position, however, is based on a misunderstanding of Arizona contract law.[3]

Under Arizona law, contract interpretation often presents a question of law. *See, e.g.*, *Roe v. Austin*, 433 P.3d 569, 574 (Ariz. Ct. App. 2018). However, Arizona law also makes clear that parties are free to present extrinsic evidence when they believe the contractual language is ambiguous. And a judge must consider that evidence before reaching a definitive conclusion on the meaning of the contractual language. That is, a judge "first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993). Arizona law grants a party the right to submit extrinsic evidence to illuminate ambiguous contract terms. Yuma has indicated it wishes to do so and Spectrum has not explained why Yuma should be denied that right.

Without citing unambiguous contractual language rendering all three 2015 agreements interdependent, Spectrum is not entitled to a determination that all the agreements were terminated when one was terminated. Spectrum's contract-based argument fails.

### B. Arizona's 2018 Law

Spectrum's second basis for claiming the IRU Agreement and CityNet Maintenance Agreement were terminated is pursuant to the 2018 Arizona law. According to Spectrum, that law "expressly" prohibits such agreements. (Doc. 81 at 6-7). Spectrum cites A.R.S. § 9-1402(B) & (C) in support of this position. Subsection (B) states, in full, "To the fullest extent allowed by federal law, this chapter occupies the entire field of licensing and regulation of video service." And subsection (C) states, in

---

[3] The IRU Agreement and the CityNet Maintenance Agreement each provide that Arizona law applies. (Doc. 1-1 at 99, 121).

relevant part,

> Except as otherwise provided in this chapter, from and after December 31, 2019 this chapter preempts and limits the ability of a local government to regulate or enforce all of the following:
>
> ***
>
> 2. Any local law and any agreement with a local government that does any of the following:
>
> ***
>
> (c) Imposes on a video service provider any requirement that is related to infrastructure, facilities or deployment of equipment that does not conform to this chapter, including office location, institutional network, build-out, line extension, investment or other operational requirements that are not directly related to the local government's management of the highways.

According to Spectrum, these provisions mean Yuma is prohibited "from enforcing 'any agreement' imposing any additional obligations on [Spectrum] except as permitted by statute." (Doc. 81 at 6-7). Yuma responds that these provisions do "not work to cancel out, vanquish or ignore any contracts or agreements outside of the statute." (Doc. 86 at 17). Spectrum replies it "may be true" that these statutory provisions do not "preempt" Yuma's "ability to contract with cable providers in the marketplace." (Doc. 90 at 7). But Spectrum claims, without elaboration, that possibility is "beside the point." (Doc. 90 at 7).

Given Spectrum's concession that A.R.S. § 9-1402(B) & (C) do not bar *all* contracts between Spectrum and Yuma, it is not clear what Spectrum is arguing regarding the statutory provisions. Spectrum seems to concede the statute was meant only to prohibit Yuma from adding new terms or conditions to uniform licenses. (Doc. 81 at 12). But, under Yuma's view of the events, that has not occurred. That is, the IRU Agreement and CityNet Maintenance Agreement are independent agreements and Spectrum's uniform license was issued without any condition requiring Spectrum continue to perform under those agreements. According to Yuma, Spectrum has distinct ongoing obligations flowing from the IRU Agreement and CityNet Maintenance Agreement.

- 10 -

1    Under that understanding of the parties' agreements, A.R.S. § 9-1402 does not have the

2    impact Spectrum argues.

3         Spectrum concedes A.R.S. § 9-1402 does not prohibit all agreements between

4    Spectrum and Yuma other than a uniform license issued pursuant to the 2018 Arizona

5    law.[4]   Because of that concession, Spectrum is not entitled to relief as a matter of law

6    pursuant to the statutory language.   The motion for judgment on the pleadings will be

7    denied and the Court must go on to examine Spectrum's arguments that Yuma has not

8    stated a plausible counterclaim for breach of contract.

9    **II.    Breach of Contract Counterclaim**

10        Spectrum's arguments regarding Yuma's breach of contract counterclaim are

11   made in terms of standing as well as failure to state a claim on which relief can be

12   granted.   Spectrum claims Yuma has not alleged any cognizable form of damages such

13   that Yuma lacks standing and dismissal under Federal Rule of Civil Procedure 12(b)(1) is

14   required.   Alternatively, Spectrum argues Yuma has not sufficiently alleged damages, a

15   required element of a plausible breach of contract claim, such that dismissal under

16   Federal Rule of Civil Procedure 12(b)(6) is required.   Whether brought under Rule

17   12(b)(1) or Rule 12(b)(6), resolution of Spectrum's argument requires looking to Yuma's

18   factual allegations to determine whether Yuma has adequately alleged a cognizable harm.

19   *See Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (assessing

20   standing based on the "factual allegations of injury"); *Chartone, Inc. v. Bernini*, 83 P.3d

21   1103, 1111 (Ariz. Ct. App. 2004) (identifying "damages as an essential element of [a]

22   breach-of-contract claim").   If Yuma has alleged a cognizable harm, it has standing and

23   has also stated a claim for breach of contract.

24        The parties agree the relevant inquiry in terms of damages is whether Yuma has

25   alleged facts showing it already suffered, or will certainly suffer, cognizable damages.

26   _____

27   [4] The statutory language would appear to prohibit Yuma from entering into *any* contract
     with Spectrum beyond the licensing agreement authorized by statute.   For example,
28   Yuma and Spectrum could not enter into a binding contract "related to infrastructure"
     even if they both agreed such a contract was entirely independent of any licensing
     matters.   Spectrum does not argue the statute should be interpreted in that manner.

Yuma alleges Spectrum's actions before and after filing this suit have required Yuma incur monetary damages connected to seeking "alternative sources for its critical communications infrastructure."  (Doc. 71 at 20).  Yuma explains this refers to the expenses associated with "preparing for the loss of the [fiber optic services]" by Yuma's "employees, contractors and attorneys."  (Doc. 78 at 9).

In its reply in support of the motion to dismiss, Spectrum does not squarely address if the cost of preparing for the contracts being rendered unenforceable is a cognizable form of damages.  Instead, Spectrum argues all of Yuma's possible damages, including any preparation costs, are attributable to the Arizona legislature, not Spectrum. In Spectrum's view, Yuma's damages "flow[] from Arizona law," not from Spectrum's activities because it is the 2018 Arizona law, not Spectrum, that terminated the 2015 agreements.  Therefore, Spectrum argues Yuma's damages are "traceable to the Arizona legislature," not Spectrum.  That does not address a central aspect of Yuma's breach of contract theory.

The IRU Agreement includes a provision requiring the parties negotiate in good faith for modifications in the event regulatory changes necessitate such modifications. According to Yuma, Spectrum refused to negotiate in good faith prior to issuance of the uniform license.  The CityNet Maintenance Agreement forbids Spectrum from taking "any action . . . that causes it to be unable to satisfy the performance requirements" of that agreement.  Yuma believes Spectrum's actions prior to issuance of the uniform license were contrary to that obligation.  For purposes of Spectrum's motion to dismiss, the Court must accept as true that, prior to issuance of the uniform license, the IRU Agreement and CityNet Maintenance Agreement were in effect.  The Court must also accept that Spectrum took actions contrary to its contractual obligations prior to issuance of the uniform license.  Finally, the Court must accept Yuma's allegations that those actions caused Yuma to incur expenses, such as the cost of preparing to rely on alternative sources for critical services.  That is sufficient to establish standing and to

state a breach of contract claim.[5]

### III.    Breach of the Implied Covenant of Good Faith and Fair Dealing and Unjust Enrichment

Spectrum sought dismissal of Yuma's two other counterclaims on grounds beyond an alleged lack of cognizable damages.  (Doc. 75 at 13-14).  First, Spectrum argued the claim for breach of the implied covenant of good faith and fair dealing was purely duplicative of the breach of contract claim.  Second, Spectrum argued the claim for unjust enrichment was not supported by allegations regarding the "enrichment" experienced by Spectrum and the connected "impoverishment" experienced by Yuma.  *See Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011) (noting claim for unjust enrichment requires enrichment, impoverishment, and "a connection between the enrichment and impoverishment").  In its opposition, Yuma did not address these arguments or even reference these two counterclaims.  Therefore, these two counterclaims will be dismissed. Because Yuma was previously granted leave to amend, and did not oppose the dismissal of these counterclaims, the dismissal will be without leave to amend.

Accordingly,

**IT IS ORDERED** the Motion to Dismiss Counterclaims (Doc. 75) is **GRANTED IN PART** and **DENIED IN PART**.  Spectrum shall answer the counterclaim for breach of contract.

**IT IS FURTHER ORDERED** the Motion for Judgment on the Pleadings (Doc. 81) is **DENIED**.

**IT IS FURTHER ORDERED** the case management deadlines set in Doc. 70 remain in place.

…

…

---

[5] Spectrum has not provided an explanation why its current position that the IRU Agreement and CityNet Maintenance Agreement have been terminated means Yuma's breach of contract claim based on pre-termination events is not viable.  That is, even assuming Spectrum establishes the IRU Agreement and CityNet Maintenance Agreement were terminated when the uniform license was issued, Spectrum has not established breaches that occurred *prior* to termination are not actionable.

1    **IT IS FURTHER ORDERED** the Motion to Stay Discovery (Doc. 82) is

2   **DENIED**.

3       Dated this 8th day of August, 2022.

Honorable Roslyn O. Silver
Senior United States District Judge